# In the United States Court of Federal Claims

WOLF CREEK RAILROAD, LLC,

      *Plaintiff,*

v.

THE UNITED STATES,

      *Defendant*.

No. 23-1684

(Filed: March 26, 2024)

*Lewis Philip Rhodes*, Reston Law Group LLP, Reston, VA, for Plaintiff.

*Sean Kelly Griffin*, Civil Division, United States Department of Justice, Washington, DC, for Defendant.

**OPINION AND ORDER**

**LERNER,** *Judge*.

      This matter comes before the Court on the Government's Motion to Dismiss for lack of subject-matter jurisdiction and failure to state a claim. Mot. to Dismiss, ECF No. 8. For the reasons below, the Court **GRANTS** the Motion to Dismiss.

**I.**    **Background**

      The United States Army Joint Munitions Command ("Army" or "JMC") owns the Milan Army Ammunition Plant ("MLAAP"), a government facility near Milan, Tennessee. Compl. at 1–2, ECF No. 1. In 2008, the Army awarded American Ordnance, LLC ("AO") Contract No. W52P1J-09-E-0001 ("Facility Contract" or "Prime Contract"), which required AO to provide operations and maintenance services for MLAAP. *Id.* at 2; Mot. to Dismiss, Attach. A, ECF No. 8-1. The Army also issued Basic Ordering Agreement No. W52P1J-09-G-0001 ("BOA") to AO, which allowed it to acquire operation and maintenance services beyond the specified tasks in the Facility Contract. Mot. to Dismiss, Attach. B at 4, ECF No. 8-2. The BOA included a statement of work for the Armament Retooling and Manufacturing Support ("ARMS") initiative. *Id.* at 15. The Government could authorize AO to use government facilities in support of third-party agreements under the Facility Contract. Mot. to Dismiss at 7. The BOA also expressly stated that the Government was not a party to tenant use agreements ("TUA") entered by AO under the Facility Contract. Mot. to Dismiss, Attach. B, at 17, ECF No. 8-2.

      In 2018, AO requested authorization from the Army to contract with Plaintiff Wolf Creek Railroad, LLC ("WCRR") to operate a rail system at MLAAP. Mot. to Dismiss, Attach. C, ECF

No. 8-3; Attach. E, ECF No. 8-5 ("WCRR's TUA").  The Army approved this request but required the contract to be construed as a TUA.  Mot. to Dismiss, Attach. D, at 1, ECF No. 8-4.  The Government reserved the right to cancel the approved use if MLAAP was closed, sold, or transferred outside the Department of the Army.  *Id.* at 3.  Any cancellation would be at no cost to the Government.  *Id.*  Additionally, the Government required the TUA to stipulate that it could not be held liable if WCRR ceased operations because of changes in MLAAP's status.  *Id.*  On June 5, 2018, AO entered a twenty-five-year TUA with WCRR (TUA No. AO 18-0002) with an optional twenty-five-year extension.  WCRR's TUA.

Two years later, in 2019, the Army notified AO that it was ending the "current mission needs for the entirety of MLAAP."  Compl. Ex. 4, ECF No. 1-4.  This notice instructed AO to "cease all [Armament Retooling and Manufacturing Support] efforts" and listed Patrick Lootens as the point of contact for further inquiries.  Compl. Ex. 4.  AO then directed WCRR to cease soliciting new leases at MLAAP.  Compl. at 4.  On April 26, 2021, the Army rescinded authorization for MLAAP facilities under all the TUAs.  *Id.*; Compl. Ex. 5, ECF No. 1-5 (substituting David Deanda as the primary point of contact).  As a result, AO terminated its TUA with WCRR.  Compl. at 4.

WCRR alleges that it submitted a claim letter via email to the Army Contracting Officer ("CO") on May 30, 2023, seeking damages from the TUA's termination.  *Id.* at 5; Pl.'s Resp. to Mot. to Dismiss ("Pl.'s Resp.") at 5, ECF No. 11.  In the same email, WCRR attached a document titled "Claim Certification."  Pl.'s Resp., Ex. 1, Attach. A, at 3, ECF No. 11-1.  The Army did not respond to the email.  Compl. at 5.  WCRR claims that it followed up with the Army on August 1, 2023, and September 5, 2023, and both times the Army did not respond.  *Id.*

On September 29, 2023, WCRR filed the instant Complaint alleging both breach of contract and the covenant of good faith and fair dealing.  Compl. at 5–6.  In response, the Government moved to dismiss the Complaint for lack of subject-matter jurisdiction and failure to state a claim.  Mot. to Dismiss.  The Government argues that the Court must dismiss this action for two independent reasons: 1) WCRR failed to properly submit a certified claim, and 2) WCRR cannot establish privity of contract with the Government.  *Id.* at 9.

## II.    Legal Standards

### A.    Jurisdiction

The Tucker Act grants this Court "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under" the Contract Disputes Act ("CDA").  28 U.S.C. § 1491(a)(2); *see also* 41 U.S.C. § 7102(a) (CDA applies to "any express or implied contract . . . made by an executive agency").  "If a plaintiff meets the jurisdictional requirements of the Tucker Act, the plaintiff also must demonstrate compliance with the mandatory requirements of the [CDA]."  *Crewzers Fire Crew Transp., Inc. v. United States*, 111 Fed. Cl. 148, 153 (2013), *aff'd*, 741 F.3d 1380 (Fed. Cir. 2014).  For this Court to exercise jurisdiction over a CDA claim, a contractor must bring an action "within 12 months from the date of receipt of a contracting officer's decision."  41 U.S.C. § 7104(b)(3).  Further, jurisdiction "requires both a valid claim and a contracting officer's final decision on that claim."  *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010).  If a claim seeks more than $100,000, it must also meet the CDA's certification requirements.  41 U.S.C. § 7103(b)(1).

### B.     Motion to Dismiss Under Rule 12(b)(1) and 12(b)(6)

The Government moves to dismiss the Complaint under Rule 12(b)(1) for lack of subject-matter jurisdiction and 12(b)(6) for failure to state a claim. Rules of the Court of Federal Claims ("RCFC") 12(b)(1), (b)(6). "In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). Plaintiff bears the burden of establishing jurisdiction by a preponderance of evidence. *Id.* "If jurisdictional facts are challenged, the court is not limited to the pleadings in determining whether it possesses subject-matter jurisdiction to entertain the plaintiff's claims." *Groundbreaker Dev. Corp. v. United States*, 163 Fed. Cl. 619, 623 (2023) (citing *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014)). If the Court lacks jurisdiction over a claim, RCFC 12(h)(3) requires dismissal.

In evaluating a Rule 12(b)(6) motion, "the court must accept all well-pled factual allegations as true and draw all reasonable inferences in the plaintiff[']s favor." *Ainslie v. United States*, 355 F.3d 1371, 1373 (Fed. Cir. 2004). Plaintiff "must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief" to state a valid claim and survive a 12(b)(6) motion. *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (citing *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007)) (finding that these facts must "raise a right to relief above the speculative level"); *Leider v. United States*, 301 F.3d 1290, 1295 (Fed. Cir. 2002) (holding that dismissal under 12(b)(6) is proper when a plaintiff "can prove no set of facts in support of [its] claim which would entitle [it] to relief"). Thus, the key inquiry here is whether Plaintiff has pled sufficient facts to draw a reasonable inference that the Government is liable. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Whether Plaintiff is in privity with the Government is a threshold inquiry impacting both subject-matter jurisdiction (i.e., whether the waiver of sovereign immunity under the Tucker Act applies) and the merits of WCRR's claims (i.e., whether the Government is liable for termination and breach of the TUA). *See First Annapolis Bancorp, Inc. v. United States*, 644 F.3d 1367, 1373 (Fed. Cir. 2011) (discussing how lack of privity impacts subject-matter jurisdiction); *Riviera Drilling & Expl. Co. v. United States*, 61 Fed. Cl. 395, 400 (2004) (collecting authority supporting opposing views that privity of contract is jurisdictional or goes to the merits). In any case, if the jurisdictional issue and the merits are "inextricably intertwined, and the former cannot be resolved without considering and deciding (at least in part) the latter[,]" the Court may "bypass[] the jurisdictional question and decide[] the merits." *Nippon Steel Corp. v. United States*, 219 F.3d 1348, 1353 (Fed. Cir. 2000); *see also Ransom v. United States*, 17 Cl. Ct. 263, 267 (1989).

### III.   Discussion

#### A.     WCRR Did Not Submit a Certified Claim.

The Federal Circuit defines a valid CDA "claim" as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract." *Zafer Constr. Co. v. United States*, 40 F.4th 1365, 1367 (Fed. Cir. 2022) (quoting 48 C.F.R. § 52.233-1(c)). If the contractor seeks more than $100,000, as is the

3

case here, the contractor must certify the claim. 41 U.S.C. § 7103(b)(1) (certification requirement generally), (b)(3) (definition of "defective certification"). No magic words are required, but the contractor must unequivocally seek the CO's final decision addressing the contractor's claim for its alleged losses. *Zafer*, 40 F.4th at 1369 (finding persuasive "a sworn statement attesting to the truth of the submission, includ[ing] detailed factual bases for its alleged losses, and . . . a sum certain based on the losses").

Because the Government challenges Plaintiff's jurisdictional assertion that a CDA claim was properly submitted and certified,[1] the Court may consider relevant evidence outside the pleadings to resolve that factual dispute. *Banks*, 741 F.3d at 1277. WCRR must show by a preponderance of the evidence that it submitted its claim to the contracting officer. *See M. Maropakis Carpentry, Inc.*, 609 F.3d at 1327, 1329 (finding "strict limits of the CDA as jurisdictional prerequisites to any appeal") (citations omitted); 41 U.S.C. § 7103(a)(1). A contractor can meet this submission requirement by sending its claim directly to the CO or to their "primary contact with a request for a final decision of the contracting officer and a reasonable expectation that such a request will be honored, and the primary contact in fact timely delivers the claim to the contracting officer." *Neal & Co. v. United States*, 945 F.2d 385, 388 (Fed. Cir. 1991) (emphasis omitted).

Here, Plaintiff relies on a purported copy of the May 30, 2023 Claim Letter, its counsel's affidavits declaring that he emailed the Claim Letter to Mr. Patrick Lootens and Mr. David Deanda, and screenshots of the emails. Compl., Ex. 2; Pl.'s Resp., Ex. 1 at 1; Pl.'s Sur-reply in Opp. to Mot. to Dismiss ("Pl.'s Sur-reply"), Ex. 1, ECF No. 18-1. In both its Complaint and Response to the Motion to Dismiss, WCRR identifies Mr. Lootens as the Army CO. Compl. at 5; Pl.'s Resp., Ex. 1 at 1. Plaintiff also alleges that it "reached out" to Mr. Deanda on September 5, 2023, another Army CO, and "confirmed through email delivery receipts" that both individuals received the Claim Letter. Compl. at 5; Pl.'s Sur-reply, Ex. 1, at 1-2. Specifically, Plaintiff asserts that it forwarded the claim to Mr. Deanda at his email address provided on the rescission letter (david.d.deanda2.civ@mail.mil). Pl.'s Sur-reply, Ex. 1, at 4; Compl., Ex. 5, at 1.

In contrast, the Government submitted two affidavits, one from Mr. Deanda and another from Mr. Beau Bixler, the CO for the Facility Contract from March 2022 to present. Def.'s Reply, Ex. 1 ("Bixler Decl."), ECF No. 15-1; Def.'s Reply, Ex. 2 ("Deanda Decl."), ECF No. 15-2. These affidavits assert that 1) Mr. Lootens, the former CO for the Facility Contract, retired on August 3, 2020, and was not an Army CO in May 2023; 2) Mr. Deanda was only a CO for this contract from December 2020 to March 2022, and never received correspondence from WCRR regarding the TUA; and 3) Mr. Bixler also never received any emails from Plaintiff or its counsel about the TUA. Bixler Decl.; Deanda Decl. Mr. Deanda also averred that the agency migrated his previous email account (david.d.deanda.2.civ@mail.mil) to a new account on November 23,

---

[1] WCRR's purported email to Mr. Lootens included the Claim Letter and FAR 33.207(c)'s certification language as two separate attachments. Pl.'s Resp., Ex. 1 at 3-5. If WCRR had timely emailed two documents, while technically deficient, it would be a curable error. FAR 33.201 (defining defective certification); *see Midatlantic Constr. & Design Assocs., Inc. v. United States*, No. 22-447C, 2023 WL 3269668, *4 (Fed. Cl. May 5, 2023) (holding that a defective certification does not deprive the Court of jurisdiction). Accordingly, any debate over certification of Plaintiff's claim is moot.

2021, at which time his previous account was deleted and not archived.  Deanda Decl.  Both Mr. Deanda and Mr. Bixler stated that these declarations were prepared after thoroughly searching their records.  Deanda Decl.; Bixler Decl.

Even if the Court took all of Plaintiff's assertions as true, "[t]he contractor bears the risk for delayed or lost submissions prior to receipt by the CO."  *Am. Pac. Roofing Co. v. United States*, 21 Cl. Ct. 265, 268 (1990); *see also Dawco Constr., Inc. v. United States*, 930 F.2d 872, 880 (Fed. Cir. 1991), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995).  WCRR contends that receipt by the Government's email server constitutes a proper submission and cites *Insight Sys. Corp. v. United States* for support.  110 Fed. Cl. 564, 581 (2013) ("[T]he Government Control exception applies where the electronic proposal is received by a government server (or comparable computer) and is under the agency's control prior to the deadline.").  But this case is unpersuasive, as it addresses an exception under FAR 52.212-1(f)(2)(i) in the context of bid protests.  *Id.*  There is no analogous carve out for contractors under 41 U.S.C. § 7104.  And even though the *Insight* court allowed an exception under the FAR, it cautioned against construing such exceptions too broadly.  110 Fed. Cl. at 575 ("Courts construing these exceptions admittedly must walk a fine line.").  Thus, the risk falls on WCRR even if it emailed the claim to Mr. Deanda and the message was redirected or lost.  *See Diversified Maint. Sys., Inc. v. United States*, 110 Fed. Cl. 612, 617 (2013) (holding that even if the court found that plaintiff mailed its claim but it was not received, plaintiff still bears the risk).

Under these circumstances, Plaintiff has presented insufficient evidence[2] that would allow the Court to conclude that the Claim Letter was actually submitted to or received by the Army CO for a final decision.  WCRR fails to meet its jurisdictional burden.  *See, e.g., id.* at 616 (comparing plaintiff's lack of evidence on its purported claim submission with defendant's affidavit asserting that "despite a thorough search," the claim letter was not found in a retired CO's files); *Emiabata v. United States*, 135 Fed. Cl. 213, 219 (2017) (concluding that plaintiff did not establish jurisdiction because he "fail[ed] to present a single document in support of his allegations"); *Capelouto v. United States*, 99 Fed. Cl. 682, 693 (2011) (dismissing suit for lack of jurisdiction because plaintiff "failed to prove that he submitted a CDA claim to any contracting officer responsible for his alleged contracts"); *L.A. Ruiz Assocs., Inc. v. United States*, 94 Fed. Cl. 768, 772 (2010) (holding that the court lacked jurisdiction because plaintiff did not present evidence that could allow the court to conclude that the letter was "actually submitted to, or received by, the contracting officer for review").

### B. WCRR Is not in Privity with the Government.

This dispute involves three contracts; WCRR is a party only to the TUA.  None of these agreements establish privity of contract between WCRR and the Army.

---

[2] It appears that Plaintiff submitted the claim letter to the wrong email address.  *Compare* Pl.'s Sur-reply, Ex. 1 (email addressed to david.d.deanda2.civ@mail.mil) *with* Deanda Decl. (showing that Mr. Deanda's email username, before and after the mailbox migration, was david.d.deanda.2.civ).  While the email Plaintiff used was listed on the rescission letter, the contractor bears the risk.

To begin, this Court must strictly construe waivers of sovereign immunity. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1557 (Fed. Cir. 1983); *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1263 (Fed. Cir. 2005) ("[T]he government does not lightly consent to suit."). The CDA provides a waiver of sovereign immunity for *contractors* because by entering directly into a contract with a party, the Government expresses an intent to open itself to a suit by that party under the Tucker Act. 28 U.S.C. § 1491(a)(1) (allowing suits based "upon [an] express or implied contract with the United States"). "When the government chooses instead to employ a two-tier contracting scheme whereby it has no direct contractual relationship with an entity, the intent . . . is not similarly apparent." *Nat'l Leased Hous. Ass'n v. United States*, 32 Fed. Cl. 454, 459 (1994). Accordingly, "[f]inding subcontractors in contractual privity . . . would represent a dramatic extension of this waiver." *Lockheed Martin Corp. v. United States*, 50 Fed. Cl. 550, 562 (2001), *aff'd*, 48 F. App'x 752 (Fed. Cir. 2002).

WCRR claims that it is in privity with the Government because AO acted as the Government's agent. Pl.'s Resp. at 13. The Federal Circuit established three prerequisites for the Government to be directly liable to a subcontractor on an agency theory. *Johnson Controls, Inc.*, 713 F.2d at 1551. To establish privity, the subcontractor must satisfy three factors: "(1) [the prime contractor] act[ed] as a purchasing agent for the government, (2) the agency relationship between the government and the prime contractor was established by clear contractual consent, and (3) the contract stated that the government would be directly liable to the vendors for the purchase price." *Id.* (citing *Kern–Limerick, Inc. v. Scurlock*, 347 U.S. 110, 112 n.2 (1954)) (emphasis omitted). Given these stringent prerequisites and the Court's review of the relevant contracts, WCRR has failed to sufficiently allege facts supporting an agency relationship between AO and the Government.

### 1. AO Did not Act as the Government's Purchasing Agent.

WCRR contends that AO was a purchasing agent because it procured services for the Army. Pl.'s Resp. at 14. In support, WCRR notes that the Facility Contract and BOA were both issued under the ARMS initiative, which aims "[t]o reduce or eliminate the cost of Government ownership of eligible facilities, including the costs of operations and maintenance" via contracts with private parties such as AO. Pl's Resp. at 14 (citing 10 U.S.C. § 7553(b)(6)). WCRR overstates AO's role, which is closer to an operator of the MLAAP facility. The implementation of the Facility Contract and BOA under the ARMS initiative does not show that AO bought WCRR's rail services for the Army. Rather, WCRR paid AO to use the facilities. WCRR's TUA at 5; Pl.'s Resp. at 15. In fact, the Army bought nothing from WCRR. At most, the Army is a third-party beneficiary of a contract between two private parties—an attenuated relationship to WCRR that cannot support privity. *See Wagner v. United States*, 71 Fed. Cl. 355, 364 (2006) (citing *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 499-500 (Fed. Cir. 1990)).

Moreover, the BOA's requirement that the Army authorize the TUAs and other third-party contracts does not show that AO was a purchasing agent. To establish an agency relationship, the Army must have "meaningful control" over AO, such as a right of control over the methods by which it accomplishes its task. *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1359–60 (Fed. Cir. 2016) (citing Restatement (Third) of Agency § 1.01 cmt. e.).

The requisite control is absent here. Instead, the TUA reflects AO's supervisory role over WCRR, rather than the Army's control over AO. For example, WCRR needs express,

written approval from AO to remove any government property from the facilities. WCRR's TUA at 4. AO and WCRR must also agree on how to conduct an environmental baseline survey and remedy environmental violations. *Id.* Similarly, AO and WCRR negotiate the length and conditions of any renewal, even if a renewed contract would be subject to the Government's approval. *Id.* And WCRR sends statements that itemize all its revenue to AO, along with documentation to support the number of railcars stored and moved. *Id.* at 5. Thus, the TUA shows AO's control over its own management of its lessees without agency interference. Indeed, "the need for [a prime contractor] to obtain [agency] approval does not create an agency relationship." *Ground Improvement Techniques, Inc.*, 618 F. App'x 1020, 1031 (Fed. Cir. 2015).

In fact, where courts have found that a contractor was a purchasing agent, the prime contract included an *express* term identifying the contractor as such. *See, e.g.*, *Kern–Limerick, Inc.*, 347 U.S. at 112 n.2 (construction contract provided that "'[t]he Contractor shall act as the purchasing agent of the Government in effecting such procurement.'"); *W. Union Tel. Co. v. United States*, 66 Ct. Cl. 38, 39 (1928) (contract provided that construction manager was "'empowered and authorized to make, as agent for the United States of America, all contracts . . . .'"). *Cf. U.S. W. Commc'ns Servs., Inc. v. United States*, 940 F.2d 622, 629–30 (Fed. Cir. 1991) (finding that a contractor was not an "agent or conduit" for an agency because the contact did not expressly allow the contractor to act as the procurement agent). No such term exists here.

At most, the ARMS statute defines entities such as AO as "property managers" performing under a "property management contract." Pl.'s Resp. at 15; *see* 10 U.S.C. § 7553. There is no explicit language identifying AO as an agent. Also, while WCRR falsely equates "property managers" to government agents, Pl.'s Resp. at 15, this argument suggests that the Government intended to create an agency relationship with every private entity it contracts with under the ARMS statute—an untenable conclusion.

### 2.     AO and the Army Did Not Consent to an Agency Relationship.

Plaintiff's allegations do not establish that AO and the Government consented to an agency relationship. The principal and agent must both manifest their assent to create an agency relationship, and this intent must be expressed in either words or conduct. *Pac. Gas & Elec. Co.*, 838 F.3d at 1359 (citing 12 *Williston on Contracts* § 35:1 (4th ed. 2016)). Again, the contracts do not contain an express term identifying AO as the Army's agent. WCRR instead relies on the BOA's seventeen references to the CO providing direction and authorization to AO. Pl.'s Resp. at 15. But these provisions simply require AO to perform certain specified actions in a manner prescribed by the agency. "Government agencies make analogous demands in every government contract," and under Federal Circuit authority, such limitations are not enough to establish clear contractual consent. *Nat'l Leased Hous. Ass'n*, 32 Fed. Cl. at 461 (citing *Johnson Controls, Inc.*, 713 F.2d at 1551).

The BOA shows the Army's intent was exactly the opposite—government approval for use of the MLAAP under the ARMS initiative was not to be construed as an extension of the Facility Contract. Mot. to Dismiss, Attach. B, at 15 ("The contractor [AO] shall be authorized to use the facilities for commercial, non-Government, third party, or tenant use under the authorization of FAR Part 45 and the ARMS Initiative. *In no instance shall the approval for use of facilities within the guidelines of this scope be considered an extension of the basic facility*

*contract*.") (emphasis added).  Likewise, the TUA specifically states that the Government is *not* a party to the tenant use agreements.  *Id.* at 17 ("3.3.7 The Government is not a party to the Tenant Use Agreements and does not deal directly with the tenants.").

WCRR claims that these provisions have "no impact on whether or not AO was acting as JMC's agent."  Pl.'s Resp. at 15.  Instead, under Plaintiff's theory, the Court should find the requisite "clear contractual consent" in the BOA's seventeen references to government authorization.  *Id*.  WCRR provides no legal authority for this argument.  The Court declines to adopt this interpretation, especially as it contradicts the plain language of the contract and would render "a portion of the contract useless, inexplicable, void, or superfluous."  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (requiring courts to interpret contracts "so as to harmonize and give reasonable meaning to all of its parts").

### 3.     The Relevant Contracts Did not "Plainly State" that the Government Will Be Liable for Termination Costs.

The BOA, a contract between the Army and AO, incorporated FAR Part 49.  According to WCRR, this incorporation—in a contract to which it was not a party—demonstrates that the Army guaranteed that it would pay termination settlement costs for any terminated TUA.  Pl.'s Resp. at 15.  But this does not serve as a plain statement "that the government would be directly liable to [WCRR] for the purchase price"—the third requirement needed to establish an agency relationship between the Government and AO.  *Johnson Controls*, 713 F.2d at 1551.  In fact, WCRR concedes that "[t]here is no 'purchase price' in the TUA."  Pl.'s Resp. at 15.

WCRR does not identify any explicit provision in FAR Part 49 allowing direct subcontractor appeals to the Government after a termination for convenience.  Indeed, direct subcontractor appeals occur in unique circumstances, none of which are present here.  Instead, FAR Part 49 provides processes by which subcontractors can seek payment from the prime contractor, but not the Government.  *See, e.g.*, FAR 49.108-1 ("A subcontractor has no contractual rights against the Government upon the termination of a prime contract.  A subcontractor may have rights against the prime contractor or intermediate subcontractor with whom it has contracted.  Upon termination of a prime contract, the prime contractor and each subcontractor are responsible for the prompt settlement of the settlement proposals of their immediate subcontractors."), 49.108-7 ("In unusual cases the TCO may determine, with the consent of the prime contractor, that it is in the Government's interest to provide assistance to the prime contractor in the settlement of a particular subcontract."), 49.108-8(b) ("[The Government's discretionary right to settle and pay any settlement proposal arising out of termination of subcontractors] *does not obligate* the Government to settle and pay settlement proposals of subcontractors.") (emphasis added).  Accordingly, the Court does not find direct, unavoidable Government liability based on Plaintiff's superficial citation to FAR Part 49.

### 4.     WCRR's Request for Jurisdictional Discovery Is Denied.

Alternatively, WCRR requests that the Court allow it to conduct discovery on whether AO and the Army had an agency relationship.  Pl.'s Resp. at 16.  Discovery is unnecessary here, and the Court declines to stay proceedings on the Motion to Dismiss to allow it.  While Plaintiff provides no persuasive legal authority for its request, when a party challenges a jurisdictional fact alleged in a complaint, the court may permit limited discovery to resolve the factual dispute.

*See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978) ("[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues."). That said, if challenges to the complaint "implicate legal questions for which no fact discovery [i]s required," then a court can deny a party's request for jurisdictional discovery. *Harris v. United States*, 868 F.3d 1376, 1378 (Fed. Cir. 2017).

   WCRR seeks to discover "communications between AO and JMC or any knowledge of JMC's directions other than what is apparent from the documents." Pl.'s Resp. at 16. This assertion regarding lack of access to communications departs from the theory of privity Plaintiff asserted in its Complaint and briefs. *See* Compl. at 3; Pl.'s Resp. at 13 (stating that this case "falls squarely" within the theory of privity discussed in *Johnson Controls*). In its jurisdictional arguments, WCRR alleges that the Facility Contract, BOA, and TUA's terms formed the agency relationship between AO and the Army. *See, e.g.*, Compl. at 3 ("At all relevant times, AO was operating as the Army's agent . . . under the Operations & Maintenance Contract [or the Facility Contract] . . . . The agency relationship between the Army and AO was established by clear contractual consent."); Pl.'s Resp. at 11 ("[B]oth the BOA and the TUA incorporate FAR Part 49, which is the FAR section governing a termination by the Government. This part of the FAR provides the basis for . . . the Claim advanced by WCRR."). Now, faced with the Motion to Dismiss, WCRR seems to suggest a second, fact-driven theory of privity—that privity may have been created via the Army's direct control over AO and WCRR's actions under the TUA.

   *Johnson Controls*' test focuses on contract provisions for proof of agency relationship, and thus does not apply when a plaintiff alleges that the government's day-to-day control over a contractor established privity. *Johnson Controls, Inc.*, 713 F.2d at 1553 ("It is also significant to note that it has not been asserted . . . that direct dealings between the government and Johnson created privity of contract[.]"). WCRR also offers no authority supporting this second theory of privity, and this court previously rejected similar arguments. *See, e.g.*, *Lockheed Martin Corp.*, 50 Fed. at 559 (finding that plaintiffs' "fact-driven theory of privity is not supported by authority, and that their factual case is, in a word, irrelevant"). Indeed, WCRR does not allege any facts showing that the Army's control over WCRR was significant such that the Government subverted AO's independent authority and "convert[ed] the government contractor into a federal agency." *Demodulation, Inc. v. United States*, 123 Fed. Cl. 98, 104 (2015) (citing *Blue Water Envtl., Inc. v. United States*, 60 Fed. Cl. 48, 51 (2004) and *United States v. Orleans*, 425 U.S. 807, 814 (1976)).

   The implications of Plaintiff's theory of privity are far-reaching. If this Court allows for discovery on this issue, then "any subcontractor who had a dispute concerning its subcontract would have the right to obtain discovery exploring the entire course of contract activity between the parties"—simply to establish jurisdiction. *Lockheed Martin Corp.*, 50 Fed. Cl. at 559 (noting that discovery involving access to about 5 million pages of documents "provide[d] a dramatic illustration" of how the privity by conduct theory "simply goes too far").

   The central issues—whether the Complaint sufficiently alleges jurisdiction under Rule 12(b)(1) and states a claim under Rule 12(b)(6)—can be resolved without further discovery. *See, e.g.*, *Lea v. United States*, 120 Fed. Cl. 440, 444 (2015) (denying plaintiff's discovery request because the court would still lack jurisdiction to entertain its noncontractual claims, even if they were factually supported). Based on the relevant contracts, WCRR fails to allege contractual privity with the Government, and the Court must dismiss the Complaint. RCFC 12(h)(3).

### IV. Conclusion

A middleman is not automatically an agent. While the Army did provide direction and authorization to AO in discrete situations, it also apparently intended to use AO "as a buffer between it and the claims of the subcontractors." *Johnson Controls, Inc.*, 713 F.2d at 1541. Thus, the agreements here have not created an agency relationship between AO and the Army, and WCRR is not in privity of contract with the Government.

For these reasons, the Court **GRANTS** the Government's Motion to Dismiss and directs the Clerk of the Court to enter judgment accordingly.

**IT IS SO ORDERED.**

                                                     s/ Carolyn N. Lerner
                                                   CAROLYN N. LERNER
                                                   Judge